## THE CAIRO AND FULTON RAILROAD COMPANY

*v.*

## TITUS AND SCUDDER.

A complainant sought to obtain a new trial in equity on the ground that the attorney of the plaintiffs in the suit at law (the defendants in this court) fraudulently concealed a written agreement, which, it was insisted, materially affected the plaintiffs' claim, to the great advantage of the defendants. It appeared that, before the suit was commenced, the plaintiffs' attorney handed the agreement to the defendants' attorney (not the counsel who tried the cause for them, however), for examination. It appeared, also, that the person who negotiated the transaction (an advance of money) which resulted in the agreement, and who made the agreement, and who professed to have been acting therein as the agent of the defendants, was a witness for the plaintiffs; that he was accessible to the defendants and their counsel, both before and at the time of the trial, but they did not examine him on the subject of the existence of the agreement, or of any such agreement. Such examination was to be expected, because the defendants claimed that in the transaction the witness acted for himself, and not for the

Cairo & Fulton R. R. Co. *v.* Titus.

defendants. It appeared, also, that there was no concealment on the part of the plaintiffs of the character of their demand.—*Held,* that, under the circumstances, the complainants had no claim to relief.

Bill for relief.   On final hearing on pleadings and proofs.

*Mr. T. N. McCarter,* for complainant.

*Mr. Joseph C. Potts* and *Mr. C. Parker,* for defendants.

The Chancellor.

The ground on which relief is sought in this case, was fully stated in the opinion delivered on the decision of the motion for a dissolution of the injunction.   *Cairo & Fulton Railroad Company* v. *Titus,* 12 *C. E. Gr.* 102.   That motion was granted, but, on appeal, the order was reversed and the cause remitted to this court to be proceeded in.   *Cairo & Fulton Railroad Company* v. *Titus,* 1 *Stew.* 269.   Though the merits of the controversy, of course, were not involved in the decision of that motion, yet, both in this court and the appellate one, views bearing upon the decision upon the merits were more or less positively expressed.   And it is claimed that the opinion of the majority of the court of errors and appeals was in direct contrariety to that of this court on the subject of the character and consequent importance in the cause of the agreement, the concealment of which is the burden of the complaint, and the ground on which a new trial in equity is sought.

To me it appeared, as it still does, quite clear that that agreement did not give to Dr. Guthrie an option to pay the $5,000 and interest, in lieu of the delivery of the bonds in case the bonds were not issued within the year, but that the provision for such repayment was a mere guarantee on his part.   It is quite unnecessary that those views, which are given at length in the opinion in 12 *C. E. Gr.,* should be reproduced here.   Though they were not concurred in by

the appellate tribunal, it is by no means clear that that court intended to be understood as rejecting them, and it will, perhaps, most truly express their position to say that they did not adopt them. Their language is: " The present appeal does not involve the merits of the controversy between the parties. The only question is, whether sufficient equity is shown to justify the court in holding the injunction until the final hearing of the cause. Was the newly-discovered evidence material to establish the complainants' defence to the action at law, and could they, by the exercise of due diligence, have discovered the same in time to avail themselves of it upon the trial ?"

" The alleged newly-discovered evidence consists of a written agreement between Guthrie and Titus & Scudder, relative to the subject matter of the controversy between the parties, a discovery of which was prayed in the bill, and which is set forth in the defendants' answer, and of the existence of which the complainants allege themselves to have been entirely ignorant until a few days previous to the filing of their bill."

" It cannot be doubted that this agreement was very important evidence on behalf of the complainants, and material to their defence of the suit. It sets forth the terms of the negotiation between the parties, and, while it is not now necessary to discuss its meaning, or to settle its true construction, about which counsel widely differ, it is sufficient to say that it lay at the very foundation of the controversy; that the cause could not have been fairly and fully tried without it; that, if produced, it must have received the serious consideration of the tribunal before which the cause was tried; and that, by it, the result of the trial might, and probably would, have been changed or materially modified."

In my judgment, it would be unjust to that court to give to this language, under the circumstances, the weight of a final adjudication upon the construction of that instrument. They merely adjudged that the injunction should be held

until the final hearing. It is not, however, designed to put the decision of this cause upon any ground which shall even seem to contravene the views or the intimation of opinion of that court. Conceding that the agreement was important testimony for the complainants on the trial at law, the question remains, whether they are shown to be entitled to any relief here because of its non-production, or the omission on the part of Titus & Scudder to communicate to the complainants' counsel at that time the fact of its existence, so that they might have availed themselves of it as evidence in their favor. Said the court of appeals : " They are not now entitled to the benefit of this evidence, or to any equitable interference with the judgment, if there has been negligence or laches on their part. If this evidence might have been discovered by the exercise of ordinary diligence on the part of the complainants, in time to be available at the trial of the cause, they are not entitled to relief." It is hardly necessary to remark that a new trial in equity cannot be had merely under cover of equitable grounds for it, but the equitable grounds must be shown to exist, and whether the relief will be granted depends upon them, and upon them alone.

The only ground for relief in this case is the agreement. The bill alleges that, if produced, it would have shown that the company were not liable to Titus & Scudder at all, or, if liable, it was only to the amount of $5,000 and interest; that the right of redemption was secured to them by the agreement.

It is a most important question, then, whether the company might, but for their inattention or negligence, or that which is attributable to them, have availed themselves of it. If this question be decided adversely to them, their case in this court fails utterly. What, then, is the proof? When Mr. Ashbel Green, the attorney and counsel of the company, called upon Mr. Potts, who was the attorney of Titus & Scudder and had the claim in his hands for collection, on the 25th of September, 1871, Mr. Potts mentioned the claim

to him.   Mr. Green, according to Mr. Potts's testimony, asked what the claim was; and Mr. Potts, as he swears, took from the safe three papers (the two acceptances and the agreement) and handed them to Mr. Green.   He says that Mr. Green stood with them in his hands two or three minutes, apparently reading them, and then asked him " what the claim could be settled for;" to which Mr. Potts replied, " for the principal, $5,000, with interest from the date of payment;" that Mr. Green asked what it would amount to ; to which Mr. Potts replied, that as the money was paid by installments at different dates, it would require a little calculation to make up the amount, and Mr. Green told him to make the calculation and drop him a line, calling his attention to the matter and giving him the amount, so that he might lay the matter before Mr. Marquand.   On the next day, September 26th, 1871, Mr. Potts wrote and sent to Mr. Green the letter which is set out in the complainants' bill, in which he said that the claim of Titus & Scudder against Dr. Guthrie amounted to $6,207.52 (principal and interest due September 30th, 1871), for which they held the acceptance of the Cairo and Fulton Railroad Company by Mason Brayman, president, for twenty-five bonds, first mortgage land grant, each $1,000, and added a request that Mr. Green would inform him whether a settlement of the claim could be made.   The testimony of Mr. Potts, that he showed the agreement at his office on the occasion above mentioned, to Mr. Green, is not contradicted.   Mr. Green merely says that the paper was not shown to him by Mr. Potts, on that occasion, to his recollection.   He also says, that he does not recollect ever to have seen it, and has no recollection of ever having heard of it, until some time after he was informed that proceedings had been instituted in Missouri on the judgment.   But Mr. Green also says, that he has no recollection of any mention having been made to him at that time of the claim of Titus & Scudder; that Mr. Potts mentioned to him some claim against Dr. Guthrie, but he cannot, at this distance of time, undertake to say

who held it.   He swears, indeed, that at the time when he
procured the entry of the appearance of the company to the
suit brought by Titus & Scudder, he had no knowledge of
the contents or existence of the agreement—but that does
not contradict the testimony of Mr. Potts.   Mr. Green has
no recollection of ever having seen the letter above men-
tioned until about the time of the commencement of this
suit, but no doubt is suggested that it was sent to him on
the 26th of September, 1871.   It came to Mr. Marquand
from the office of Mr. Green's law firm, a long time after-
wards, among other papers pertaining to the railroad com-
pany's business sent from there.   But, further, Mr. Marquand
says, in his testimony, that he thinks that in September he
heard directly from Mr. Potts, or from Mr. Green after his
interview with Mr. Potts, that Titus & Scudder had a claim
against the company.   He says that was what induced him
to make inquiries about it from the officers of the company,
and he says that the president and attorney said : " We
know about that; that is a private matter of Guthrie's; the
company have nothing to do with it."   He acknowledged
service of the writ on the 28th of November, 1871.   So that,
before the suit was commenced, he knew that the president
and attorney of the company not only professed to be fully
acquainted with the claim which Titus & Scudder made
against the company, but professed to be satisfied, not only
that it was no valid claim against the company, but that it
was a mere private claim of Dr. Guthrie's.

   Again, there is not the slightest ground for any claim
that there was either misrepresentation or concealment on
the part of Titus & Scudder.   The letter of September 26th,
1871, refers to the claim as a claim against Dr. Guthrie, and
mentions the acceptances.   Here is surely evidence that the
claim against the company was presented without conceal-
ment.   According to Mr. Marquand, the president and
attorney both knew the character of the claim, and not only
denied that there was any liability on the part of the com-
pany in respect to it, but declared that it was merely a pri-

vate debt of Dr. Guthrie's. With this knowledge and the information derived from the acceptances themselves, the company came to the trial. Their counsel asked no question of Dr. Guthrie about the agreement. Dr. Guthrie, on the trial, testified that he borrowed the money for the company. Their counsel says that Dr. Guthrie told him before the trial that the acceptances were the only thing fixing liability on the company, and yet he refrained from cross-examining him on the subject. He gives no reason for this, but says that it is difficult for him, at this time, to say what his reason was, though he had a reason that was satisfactory to himself at the time; that he had other relations with him, &c. The suit was against the company, to recover the value of the bonds, and a count had been added to the declaration with a view to the admission of proof that the money was borrowed for the company.

Guthrie appears to have been accessible to the counsel of the company before the trial, and they appear to have conversed with him on the subject of the transaction with a view to the defence. Moreover, the company, though they postponed the trial because of the absence of Brayman at the previous term, do not appear to have made any effort to obtain his presence or his testimony. On this point the counsel who tried the cause for the company says he cannot now tell why the testimony of Brayman was not procured.

But further: On the trial Dr. Guthrie testified that the orders for the bonds (the acceptances), which called for bonds to be issued under a contract, were put in that form without consultation with Titus & Scudder, or anybody else. He says: "The order was worded in this manner to avoid the necessity of acknowledging that the Cairo & Fulton Railroad Company were selling its bonds at that price, but that I myself, as an individual, took the responsibility or having sold those bonds, although it was for the company, and the money was used by the company; but it was not desirable that the Cairo & Fulton Railroad Company should be recognized and known as having sold the bonds at so

Cairo & Fulton R. R. Co. *v.* Titus.

very low a figure, and to avoid this that order was drawn to refer to a contract that was even then abrogated." To the suggestion, by way of question, "It did not refer to the bargains between you and Titus?" he answered: "Simply for prudential reasons; for the interest of the company it was not desirable to acknowledge that we were selling any bonds or had sold any for the company." He then said the contract was afterwards abrogated. It would seem to have been very much a matter of course for the counsel of the company to have inquired, in cross-examination, as to the evidence of the agreement between the witness and Titus, with whom the negotiation was conducted in behalf of his firm. On cross-examination, Guthrie said: "Whether Titus approached me with regard to these bonds, or I him, I am not able to say, but the question was mooted between us as to the value of the Cairo & Fulton bonds prospectively, and as to my authority to dispose of a certain quantity of those bonds for money; that negotiation was carried through, and an agreement made that I was to receive from them $5,000, for which they were to receive from the Cairo & Fulton Railroad Company, in due course of time, twenty-five of the first mortgage bonds of the company on an issue of $5,000,000; that money was paid to me (my memory is) in three installments, but I have no papers with me to verify that fact, but the whole $5,000 were paid to me, and the order upon General Brayman was given as a guarantee for the delivery of the bonds to them."

Again, it would seem that an inquiry as to the evidence of the agreement here mentioned would have been natural, but no such inquiry was made. On the other hand, inquiry was made of the witness as to what he said to Titus in reference to the necessities of the company as to the money, to which he replied that he told Titus, in general terms, that he (Guthrie) and Brayman, had each spent a great deal of money for the company, and that the company were in necessitous circumstances, and needed the means to publish maps, to get out prospectuses, to publish pamphlets, which

they were then using in an endeavor to carry their line through Texas to the Mexican line, by additional aid from congress; that they had re-organized the company out of funds of their own, mostly Guthrie's, and had paid the expenses of the meeting of the board of directors from time to time. To the question: "Was the money you received of Titus part of the money returned to you for money advanced?" he replied: "Some, a small part of it, was paid to me for my advances and my salary; most of it was used for the affairs of the company at Little Rock and New York, and part of it, I remember now, went for the recovery of the papers and books of the company, which were found in Texas by an agent we sent for them; they had been carried off by the confederate government during the occupancy of Little Rock." And, in this connection, it may be remarked that the letter of June 6th, 1871, from Brayman to Guthrie, corroborates the latter, and goes very far towards showing that the transaction was, indeed, in behalf of the company, and was understood by Guthrie and Brayman to be a sale of the bonds of the company by the company without reference to the contract, and that the company had the proceeds and benefit of the transaction. The proof also shows not only that bonds to a very large amount were issued to the contractors under the contract, but that Dr. Guthrie received from the company bonds to the amount, at their par value, of $35,000, for his interest in the contract. And it shows, further, that the rights of Titus & Scudder, under the acceptances, treating them merely as orders drawn by Guthrie on his own account, and not in behalf of the company, were entirely ignored.

The bill will be dismissed, with costs.